# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JOSEPH KAYE

              Plaintiff,

v.                                        Case No. 05-CV-982

MIKE D'AMATO, JULILLY KOHLER,
LINCOLN FOWLER, SHIRLEY FERGUSON,
and LISA CHRISTOPHERSON

              Defendants.

---

## ORDER

On September 13, 2005, plaintiff Joseph Kaye filed a complaint in this court, alleging that defendants had violated the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), Title 18 U.S.C. 1962(b)-(d), and its state law counterpart, the Wisconsin Organized Crime Control Act ("WOCCA"), Wis. Stat. § 946.87(4). Defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) as well as to impose sanctions pursuant to Fed. R. Civ. P. 11. Though plaintiff opposed these motions, the court granted the motions for dismissal and for sanctions on July 11, 2006. Plaintiff appealed the court's order, and on December 17, 2007, the Seventh Circuit Court of Appeals ruled that it was without jurisdiction to hear either matter, because this court had not dismissed Kaye's case with prejudice, and because this court had not yet set the amount of sanctions. Thereafter, on February 13, 2008, this court granted plaintiff thirty days within which to file an amended complaint. Plaintiff filed his amended complaint on March 11, 2008. Defendants moved that this amended complaint also be dismissed pursuant

to 12(b)(6). Upon considering the parties' submissions, as well as the relevant statutory and case law, the court grants the defendants' motion to dismiss.

## I. BACKGROUND

Plaintiff is an attorney and real estate developer. Defendants include the former alderman of Milwaukee's Third Aldermanic District (D'Amato), a former commissioner of the Milwaukee City Plan Commission (Kohler), a former commissioner of the Redevelopment Authority of the City of Milwaukee (Fowler) and two former directors of the East Village Association (Ferguson and Christopherson). Plaintiff alleges that defendants exploited their official positions in order to secure property and influence. According to plaintiff, sometime in 2005 the Redevelopment Authority of the City of Milwaukee ("RACM") sold a piece of piece of property on Kane Place to Kohler for $500 less than Kaye offered to pay for it. (Am. Compl. ¶ 18-24). Plaintiff states that in consideration of this sale from the RACM (of which Fowler was a commissioner) to Kohler, Kohler arranged for the City Plan Commission ("CPC") (of which Kohler was a commissioner) to sell city-owned property on Humboldt Boulevard in a private no-bid sale to a company named Altera, which is owned by Fowler. (Am. Compl. ¶ 36). Plaintiff also asserts that Kohler, D'Amato, and others changed the method by which the Eastside Village Association ("EVA") elected its officers (in violation of the EVA's bylaws), so that they could maintain control over the EVA. (Am. Compl. ¶ 63-65). A significant impetus for this scheme to maintain control over the EVA was to ensure passage of an ordinance that would create a "Conservation Overlay District" in the East Village neighborhood,

and to ensure that Kohler's planned development at the Kane Place property was exempted from the zoning restrictions imposed by the Overlay District ordinance. (Am. Compl. ¶ 62). Plaintiff alleges D'Amato engaged in activities designed to intimidate critics. One such activity consisted of D'Amato, allegedly, publicly announcing that Kaye was blacklisted from further development projects with the city and its agencies. (Am. Compl. ¶ 89). Another such activity involved D'Amato removing a sign from Jill Bondar's yard which stated "No Overlay District Ald. D'Amato," and then allegedly threatening police actions and consequences at Ms. Bondar's job (with the Department of Public Works) for having put up the sign. (Am. Compl. ¶ 87-88). Plaintiff makes numerous other accusations and innuendos which either do not implicate any of the defendants, or otherwise fail to evidence sufficient predicate acts.

## II. APPLICABLE LAW

On a motion to dismiss, the court accepts all factual allegations in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff, but the court is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim. *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001) (citations omitted). Dismissal of a complaint for failure to state a RICO claim is granted if plaintiff fails to "allege 'enough facts to state a claim to relief that is plausible on its face,'" the number of facts required will vary depending on the complexity of the case. *Limestone Development Corp. v. Village of Lemonth, Illinois, et al.*, 520 F.3d 797, 803 (7th Cir. 2008) (citing *Bell*

*Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (U.S. 2007). Additionally, allegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a plaintiff to plead all averments of fraud with particularity. *Slaney*, 244 F.3d at 597. Although the court liberally construes allegations in a pro se litigant's complaint, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), the court does not apply this principle of construction to Kaye's complaint because Kaye is an attorney. *Lockhart v. Sullivan*, 925 F.2d 214, 216 n.1 (7th Cir. 1991) (citation omitted) ("While we treat pro se litigants gently, a pro se attorney is not entitled to special treatment."), abrogation on other grounds recognized by *Williams v. Chicago Bd. of Educ.*, 155 F.3d 853, 857 (7th Cir. 1998).

Kaye alleges violations of 18 U.S.C. §§ 1962(c), and 1962(d). 18 U.S.C. § 1962 states:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Id.* Each of the plaintiff's RICO claims requires that he adequately plead a "pattern of racketeering activity." *Id.* A "pattern of racketeering activity" requires at least two acts of racketeering activity that occurred within 10 years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" encompasses certain so-called "predicate acts," which are actions indictable under specific federal statutes, as well as "any act or

Case 2:05-cv-00982-JPS   Filed 12/18/08   Page 4 of 27   Document 100

threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). A "pattern" of racketeering activity involves more than simply counting the predicate acts involved. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238 (1989). A pattern requires a showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239. The former requirement may be described as a "relatedness" requirement, *id.*, and the latter a "continuity requirement." *See id.* at 240. Predicate acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* The continuity requirement is satisfied if the predicate acts occurred for such an extended period of time that a threat of future harm is implicit or if the predicate acts, while short-lived, show clear signs of threatening to continue into the future. *See Roger Whitmore's Auto. Servs. v. Lake County*, 424 F.3d 659, 673 (7th Cir. 2005) (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir.1992)). The court analyzes continuity under a multifactor test, including: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Roger Whitmore's Auto. Servs.*, 424 F.3d at 673.

Case 2:05-cv-00982-JPS   Filed 12/18/08   Page 5 of 27   Document 100

Kaye's amended complaint enumerates the following alleged predicate acts:[1]

1) Extortion - Alderman D'Amato publicly announcing that plaintiff was blacklisted was designed to stop plaintiff from speaking out against D'Amato.

2) Wire Fraud - D'Amato, Kohler, and Ferguson utilized the internet to instruct their partisans on how to vote under the new voting method in the EVA election in order to ensure victory for D'Amato's preferred directors.

3) Extortion - D'Amato stole Jill Bondar's political sign and threatened her with a citation and consequences at her city job in order to prevent her from protesting the Conservation Overlay District.

4) Extortion - Police officers threatened East Village residents with arrest if they tried to enter the November 2, 2005 meeting of the New East Village Resident Neighbors, Inc. (a neighborhood organization created by defendants after they lost control of the EVA).

5) Bribery - the contemporaneous sales of city-owned real estate to Kohler and Fowler, made for each other, reciprocally and in consideration of each other.

6) Honest Services Fraud - Each of several instances where land sales or subsidy decisions were improperly steered by, or even to, public officials responsible for these determinations constitutes honest services fraud in violation 18 U.S.C. § 1346.

_____

[1] Kaye also references other events, such as something he refers to as the "You're Fired" scheme, and instances of a Brian Delfosse receiving a building code citation, as well as the Bondars being summoned to appear before the Licensing Committee. It is little surprise Kaye does not enumerate these as predicate acts, as Kaye has not alleged any facts in connection with these events that could support the view (even given the deference due on a motion to dismiss) that these events were RICO predicate acts.

### A.    Extortion

With regard to Kaye's three extortion allegations, two constitute properly alleged predicate acts.  "Extortion" is defined in federal law as:  "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  Unable to meet this definition of "extortion," Kaye alleges violations of the state extortion statute, which provides in relevant part:

> Whoever, either verbally or by any written or printed communication, maliciously threatens to accuse or accuses another of any crime or offense, or threatens or commits any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling or trade of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against the person's will or omit to do any lawful act, is guilty of a Class H felony.

Wis. Stat. 943.30(1).  Kaye's allegation that D'Amato publicly announced that Kaye was blacklisted from any further real estate dealings with the city meets this definition of extortion, as that act constitutes a threat to injure the business of another with the intent to compel the person (Kaye) to refrain from engaging in lawful activity (voice public criticism of D'Amato).  Defendants contend that Kaye has not properly pleaded this allegation, as they assert Kaye does not say who attended the ceremony, who heard the statement, and that Kaye does not allege he was actually blacklisted.  (Def.'s Mem. Supp. Mot. Dismiss at 27).  All of defendants' arguments on the matter miss the mark.  The statute makes a "threat" illegal, thus it is irrelevant if Kaye was blacklisted or not; additionally, as to who was in attendance, and who

heard the statement, Kaye alleges the statement was made in public, which is sufficient, for once such a statement becomes public, it cannot be contained. Finally, Kaye obviously heard, or learned of, the statement, which thus means the statement was effective in threatening its intended target – Kaye.

Similarly, Kaye's allegation that police officers threatened to arrest certain East Village residents if they tried to enter the November 2, 2005 public meeting of the newly formed neighborhood association meets the above definition of extortion. Defendants fault this allegation with the fact that Kaye does not allege that D'Amato was directly involved in the extortion. (Def.'s Mem. Supp. Mot. Dismiss at 27). The closest Kaye comes to implicating one of the defendants in this act of extortion is Kaye's statement that "D'Amato's aide, Sam Rowen, was there watching so it's a logical inference that the alderman arranged for the three City police officers." (Am. Compl. ¶ 82). Despite defendants' assertions to the contrary, the court agrees that this is a logical inference, albeit, certainly not necessarily the correct one. As the court is constrained to draw all reasonable inferences in favor of the plaintiff, the court finds that this is a sufficiently alleged predicate act. Indeed, the only way for plaintiff to muster more specific facts pertaining to this incident would be through the use of discovery - which would always remain unavailable to RICO plaintiffs if allegations that could only be proven through discovery were routinely dismissed at the pleading stage.

The third alleged act of extortion, D'Amato's taking of Ms. Bondar's political sign, and threatening her with citation and consequences at her job, does not

constitute a sufficiently alleged act of extortion under either 18 U.S.C. § 1951(b)(2) or Wis. Stat. 943.30(1). Kaye claims that D'Amato took Bondar's sign, then left a message on her phone that said that the police and the management of the Department of Public Works (the very department for which Bondar works) were interested in knowing who put the sign up. (Am. Compl. ¶ 87). Kaye claims that this conduct amounted to extortion, because D'Amato threatened Bondar in order to prevent her from exercising her free speech rights and her property rights (by retrieving the sign). The court, however, disagrees and takes judicial notice[2] of a case, based on the same event, decided before Magistrate Judge Callahan in this district – *Bernie Bondar, et al., v. Michael D'Amato*, Case No. 06-CV-109 (AUTOIST. March 31, 2008). In that case, Magistrate Callahan, in granting D'Amato's motion for summary judgment, held that the sign in question (which was attached to a tree in the "tree border" – the area between the sidewalk and the street), was affixed to a tree located on a public thoroughfare in violation of City of Milwaukee Ordinance § 244-18-1.[3] *Bondar v. D'Amato*, Docket #55 at 18. Thus D'Amato, as alderman, was wholly justified in removing the sign, and as Magistrate Callahan also found, there is no evidence (and in the instant case there isn't even an allegation) that D'Amato selectively enforced the ordinance against Bondar because of her criticism

---

[2] *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) ("In ruling on a 12(b)(6) motion, a district court may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment.")

[3] "It shall be unlawful for any person, except a public officer or a government employee in the performance of a public duty, to maintain, place . . . or otherwise fasten any . . . sign, poster, advertising, or notice of any kind, or cause the same to be done, on any curb, streetwalk, or public thoroughfare surface . . . tree . . . or structure of any kind on public ground . . . within the city . . . ." City of Milwaukee Ordinance § 244-18-1.

Case 2:05-cv-00982-JPS   Filed 12/18/08   Page 9 of 27   Document 100

of D'Amato. *Id.* Docket #86 at 16. Moreover, the court agrees with Magistrate Callahan that the message left by D'Amato for Bondar "cannot be reasonably construed as 'threatening or harassing' or intimating that punishment, sanction, or adverse regulatory action will imminently follow." *Id.* Docket #55 at 23 (citing *Chicago Reader v. Sheahan*, 141F. Supp. 2d 1142, 1145 (N.D. Ill. 2001). Therefore, the court finds that D'Amato's actions and statements related to the removal of Jill Bondar's sign did not constitute extortion, thus this incident does not a predicate act make.

## B. Bribery

Kaye's allegations of bribery do not sufficiently allege predicate acts. If Kohler and Fowler did steer the sales of city owned property to one another, in consideration for the other doing the same, that would constitute a violation of Wis. Stat. 946.10. Defendants point out that these land sales were approved by many different councils and committees and even the mayor himself signed off on both of them. (Defs.' Mem. Supp. Mot. Dismiss at 8-9). However, the bribery statute in question makes it illegal to offer a public officer a personal advantage in order to influence his or her behavior, and it makes it illegal to accept a personal advantage in exchange for engaging in a certain behavior. Thus, Kaye's pleading is not necessarily deficient just because the land sales were approved by other members of the city government. Indeed, in this court's ruling dismissing plaintiff's first complaint, the court acknowledged that the land sales were so approved (Order, Docket #53 at 9 n. 4), yet went on to presume for the purposes of deciding the

Case 2:05-cv-00982-JPS   Filed 12/18/08   Page 10 of 27   Document 100

motions before the court that Kaye had sufficiently pled allegations of bribery. (*Id.* at 10). There was no problem in this as Kaye's first complaint was so plainly lacking that the court had ample reason to dismiss it without unnecessarily expending even more time by examining fully the sufficiency of these bribery claims. However, at this stage of the proceedings, the court finds it prudent to take a closer look at these alleged predicate acts.

Upon closer examination, the court finds no factual allegations sufficient to support an allegation of bribery. As defendants point out, Kaye has not alleged a single communication between Fowler and Kohler, nor has he alleged any facts to support a reasonable inference of an illicit agreement between the two. (Defs.' Mem. Supp. Mot. Dismiss at 18). Kaye would have the court infer such an agreement based on his allegations that he offered a "better proposal and higher bid" on the Kane Place property, and that another developer offered a bid twenty-five times more for the Humboldt property than Fowler paid, yet the city nonetheless sold the Kane property to Kohler and the Humboldt property to Fowler. (Am. Compl. ¶ 20, 23-24, 37). As to the Kane Place property, Kaye's bid, according to Kaye, was $500 higher than Kohler's. (Am. Compl. ¶ 20). Whether the actual amount of difference was $500 or $5,000, the court finds those sums too small to create any significant differentiation between the two bids. As to whether Kaye's proposal was "better," that is not an issue that this court considers to be within its purview; suffice

it to say that the court finds the RACM's explanation[4] for why it sold to Kohler to be sufficient to rebut Kaye's unsupported accusations of bribery. As for the Humboldt property, defendants cite a Land Disposition Report submitted to the Common Council of the City of Milwaukee, which explains that the Department of City Development ("DCD") was selling to Fowler, not Busalacchi (the "other developer" offering 25 times more than Fowler, to which Kaye refers in his amended complaint), because Busalacchi had failed to close on the property, and Fowler's was the only proposal DCD received in response to its Request for Proposal from interested parties. (Defs. Mem. Supp. Mot. Dismiss at 9 n. 7). Though these facts render Kaye's allegation hollow, Kaye nonetheless does not refute them.

Ultimately, Kaye alleges no facts to support his allegation that the commissioners bribed one another through an illicit land swap. Instead, Kaye extrapolates his inferences from the parallel nature of the events. Defendants would have the court reject drawing any inference from the parallel nature of the events. To support their position, they point to *Bell Atlantic Corp. v. Twombly*, in which the Court upheld the dismissal of a claim alleging violation of the Sherman Act because

---

[4] "The Authority worked with the adjoining owner rather than marketing the property since assemblage results in greater investment. Staff first worked with the previous adjoining owner, but his project was never formally submitted because the proposed density was objectionable to neighborhood groups. He then sold the property to Kane Place, LLC and we have been working with Ms. Kohler on site issues a conceptual plan that would address neighborhood concerns." Redevelopment Authority Common Council of the City of Milwaukee, "Land Disposition Report," May 19, 2005, http://legistar.milwaukee.gov/attachments/26970.doc. *See also* Sean Ryan, *Milwaukee officials accused of racketeering*, The Daily Reporter, Sep. 16, 2005 ("In a July 15 letter, Joel Brennan, the Redevelopment Authority's assistant executive director-secretary, said the city recently signed an option to purchase with Kohler's Kane Place LLC for the property. Compared to the two houses in Kaye's proposed development, Brennan wrote, Kohler's ability to combine her lot with the city's would contribute more to the city's tax base than if our lots had been sold on their own - likely in excess of $4.0 million.") available at http://findarticles.com/p/articles/mi_qn5302/is_20050916/ai_n24422965.

the plaintiff's claim that the defendants engaged in parallel anti-competitive acts was not – "absent some factual context suggesting agreement" – sufficient to allege the requisite agreement. 127 S.Ct. 1955, 1961 (U.S. 2007). There are problems with applying this holding from *Twombly* to the instant case though, specifically the fact that *Twombly* is an antitrust case, not a racketeering case. Central to the Court's reasoning is the fact that while parallel anti-competitive acts are "consistent with conspiracy," they are also "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 127 S. Ct. at 1964. Thus, in general, parallel acts in a racketeering case are more indicative of agreement than in an antitrust case, because there often is not a neutral force – such as the market – which would be expected to create the parallel actions on the parts of the alleged conspirators. Indeed, while the market might often indicate to competing businesses that the same type of behavior would be beneficial to each of them, it is difficult to conceive of a way in which the market would often indicate to city government entities that they should sell city-owned land to city commissioners. However, though the court disagrees with defendants as to the general applicability to racketeering cases of *Twombly's* treatment of parallel events, the court nonetheless does find that in this particular circumstance the decisions to sell the properties to commissioners were not motivated by nefarious forces. Rather, the court finds that the city sold the Kane Place property to Kohler because it believed her project would be more beneficial to development and tax rolls than would be Kaye's. Similarly, it sold the Humboldt

-13-

property to Fowler because, after the previous developer failed to close, Fowler's was the only bid on the property, as well as the fact that Fowler's project would be highly beneficial to development and tax rolls as well. Accordingly, the court finds that Kaye has failed to plead any predicate acts with regard to the sale of either property.

### C.  Wire Fraud

Similarly, Kaye's wire fraud allegations are insufficient. He alleges that some of the defendants engaged in wire fraud by using the internet to orchestrate a plan to retain control of the EVA by changing the EVA election's voting method. Kaye alleges the EVA's bylaws required voting to be conducted by simple majority voting, but that Christopherson and Ferguson – as directors of the EVA – along with the help of D'Amato and Kohler, arranged so that the EVA election would be done utilizing the single transferable vote method. (Am. Compl. ¶ 62-63). According to Kaye, not only is this method not authorized by the bylaws, but it also allows an organized minority to overcome the wishes of an unorganized majority, and the defendants used email in order to organize themselves in order to elect the people they preferred. (*Id.* ¶ 63-65).

Even if all the facts alleged above are true, they do not amount to wire fraud. To show an act of wire fraud under 18 U.S.C. § 1343, the plaintiff must show: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the...wires...in furtherance of the fraudulent scheme." *United States v. Radziszewski*, 474 F.3d 480, 484-85 (7th Cir. 2007). "A

scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of material fact.'" *U.S. v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007) (quoting *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005). Here, Kaye has not alleged any misrepresentations, omissions, or half-truths. Indeed, the only communication referred to by Kaye is but a single email that is not directed towards any of the victims of the alleged scheme, nor for that matter even alleged to be dishonest.[5] True, the wire communication need only be "incident to an essential part of the scheme," *Pereira v. United States*, 347 U.S. 1, 8 (1954), and there is no requirement that the communication itself contain a misrepresentation. *Schmuck v. U.S.*, 489 U.S. 705 (1989). However, the communication does have to be part of a scheme involving false representations. *See U.S. v. Pritchard*, 773 F.2d 873 (7th Cir. 1985) (listing "false representation" as an element of 18 U.S.C. § 1343). In the instant case, Kaye has not alleged a situation where anyone was misled or fraudulently induced to engage in any activity to their own detriment. Kaye has rather alleged a breach of the EVA's bylaws. While the law certainly offers remedies for those aggrieved by such a breach, 18 U.S.C. § 1343 does not. When Kaye was confronted by similar arguments in defendants' brief (Def.'s Mem. Supp. Mot. Dismiss at 21-24), his response was simply to claim "[s]tealing an election is a variety of fraud" (Pl.'s Br. Opp. Mot. Dismiss at 7), and then cite *United States v. Clapps*, 732 F.2d 1148, 1153 (3rd Cir. 1984). To say that Kaye's position on the

---

[5] Kaye states that the email in question (the one act involving the wires) was from Ferguson to voters she felt she could rely on, and the email said "We need to vote in this order for At Large nominations: 1 Mark, 2 Todd, 3 Ginger, 4 Norbert - do not deviate from that order. DO NOT vote for anyone else." (Am. Compl. ¶ 65).

-15-

holding in *Clapps* is over-broad would indeed be an understatement. *Clapps* holds that use of the postage system in a scheme involving "the fraudulent procurement and marking of absentee ballots" constitutes a violation of the mail fraud statute. 732 F.2d at 1149. Unlike the defendant in *Clapps*, who sent deceptive and untrue communications in order to obtain the absentee ballots, Kaye has not alleged that the defendants in the instant case made any deceptive or untrue statements. Kaye's allegations, if true, mean that three of the four defendants are guilty of breaching the EVA's bylaws; such an act does not amount to any of the various forms of predicate acts recognized by the RICO statutes.

### D. Honest Services Fraud

Kaye's final alleged predicate acts consist of several transactions which he states constitute "honest services" fraud. "Honest services" fraud refers to 18 U.S.C. § 1346, which provides that for the purposes of the mail and wire fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. It appears that Kaye believes that several instances in which Kohler and Fowler received grants, blight designations, and zoning determinations for their properties constitute honest services fraud. (Am. Statement at 1). In 2003, D'Amato sponsored a resolution in the Zoning Neighborhoods and Development Committee ("ZND") to have a lot owned by Kohler replatted, which allowed Kohler to resell the lot at a profit. (Am. Compl. ¶ 16). Separately, the DCD granted Kohler a zoning designation for the Kane Place property so that she could replat the lots in a way that would otherwise

-16-

be prohibited by the "Conservation Overlay District." (Am. Compl. ¶ 30). Additionally, the DCD granted Kohler a waiver from the requirement, applicable to all new development along the river, that she include a public riverwalk along her property. *(Id.).* The City granted Fowler several grants to help deal with environmental issues on the Humboldt property. (Am. Compl. ¶ 42). Additionally, the city aided Fowler's development of the Humboldt property through a $1.4 million low interest loan. (Am. Compl. ¶ 41). There are other such alleged instances in Kaye's amended complaint, but the above summarized instances are sufficient for the court's ruling.

Many of these alleged acts have not been pled in accordance with the heightened pleading standard required by Fed. R. Civ. P. 9(b). To comply with 9(b), a plaintiff must include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." The only such act in the amended complaint that comes anywhere close to being sufficiently pled is found in paragraph 16, where Kaye alleges D'Amato sponsored the regulation that would allow Kohler to replat one of her lots. (Am. Compl. ¶ 16). It is possible to infer that Kaye is alleging that D'Amato misrepresented to the ZND the advisability of such a replatting. However, there is no allegation as to the place, time, or content of the communication. As to all the other alleged instances, there is no mention of who did what where, and how what they did constituted a misrepresentation or omission. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990) (describing Rule 9(b)

particularity as "the who, what, when, where, and how: the first paragraph of any newspaper story"). Additionally, "Honest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain." *U.S. v. Antico*, 275 F.3d 245, 262-63 (3rd Cir. 2001) (citing *United States v. Woodward*, 149 F.3d 46, 54-55 (1st Cir.1998)). There is nothing in Kaye's allegations to support a theory based on either of those scenarios. Similarly, there is nothing in Kaye's allegations to support a finding that he has sufficiently alleged any predicate acts consisting of honest services fraud under 18 U.S.C. § 1346.

### E.    Pattern

Even if a reviewing court was to find that this court had erred in finding that only two of Kaye's allegations were sufficient, the ultimate result would remain the same, as not only are most of Kaye's predicate acts insufficiently pled, but Kaye has also failed to plead a pattern of racketeering. A pattern of racketeering requires a showing "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (U.S. 1989) (emphasis in original). Predicate acts are "related" if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are not isolated events." *Id.* (quoting 18 U.S.C. § 3575(e)). When viewed broadly enough, Kaye's alleged predicates could be described as "related" in the sense that he alleges that the defendants acted to ensure that city entities made decisions pertaining to land sales, zoning, and grants

in favor of Kohler and Fowler, and that they acted to stifle critics of D'Amato. However, "the relatedness of racketeering activities is not alone enough to satisfy [the] pattern element . . . . [t]o establish a RICO pattern it must be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.* 492 U.S. at 240 (emphasis in original).

It is the continuity element on which Kaye's claim – even if all his predicate acts had been properly alleged – undeniably fails. Continuity is described as being "both a closed- and open-ended concept." *Id.* at 241. A course of criminal conduct that has ended can fulfill the closed-ended concept if the related predicates occurred over a "substantial period of time." *Id.* at 242. "The underlying rationale is that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 -1023 (7th Cir. 1992). Open-ended continuity, on the other hand, lacks the duration and repetition found in closed-ended continuity, but the predicate acts are such that the threat of continuity is demonstrable. *H.J. Inc.*, 492 U.S. at 242. Thus, the court will not infer threat of continuity when predicate acts have not occurred over a substantial period of time (as it would infer in a closed-ended continuity situation), rather, the plaintiff will have to show that there is a threat of continuity. In the instant case, all the defendants no longer hold the official positions they are alleged to have exploited, thus it is clear that Kaye's predicate acts do not allege open-ended continuity. Indeed, Kaye appears to concede as much. (Pl.'s

Resp. Memo. Opp. Defs.' Mot Dismiss at 9-10). However, Kaye is adamant that his allegations are sufficient to plead close ended continuity. (*Id.*)

Though the Supreme Court has not defined how "substantial" an amount of time is necessary to satisfy close-ended continuity, it is nonetheless safe to say that if the court is correct in its finding that only two of the predicate acts Kaye alleges are sufficiently alleged, then Kaye's amended complaint without question fails to allege close-ended continuity. Indeed, a "pattern" consisting of one allegation of D'Amato arranging for police to prevent certain people from entering a neighborhood association meeting on November 2, 2005, and one allegation of D'Amato publicly blacklisting Kaye on June 11 2004, is no pattern at all. Those two acts, occurring some seven months apart, though arguably related in purpose, are woefully inadequate to create "an implicit threat of continued criminal activity in the future." *Midwest Grinding, Co.*, 976 F.2d at 1023. If, however, the court is mistaken in its refutation of the majority of Kaye's alleged predicate acts, the result is less glaringly obvious but, in the final analysis, just as certain.

To satisfy closed-ended continuity, the predicates must have "'extend[ed] over a substantial period of time' and threaten to recur in the future." *Midwest Grinding Co.*, 976 F.2d at 1024 (quoting *H.J. Inc.*, 492 U.S. at 242). A very helpful tool in determining whether there is closed-ended continuity is the 'multifactor continuity test' found in *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986). The factors the court looks to under this test are: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims,

the presence of separate schemes and the occurrence of distinct injuries." *Morgan*, 804 F.2d at 975. In order to properly apply the test, the court will lay out all the alleged predicate acts chronologically. Sometime circa 2000-2002 the decision was supposedly made to sell the Kane Place property to Kohler. In July 2003, D'Amato sponsored a resolution to allow Kohler to replat a different lot she owned. In March 2004, the city refused Kaye's higher bid on the Kane Place property. In June 2004, D'Amato announced in public that Kaye was blacklisted from land deals with the city. In September 2004, D'Amato took Jill Bondar's sign, and the Humboldt property was sold to Fowler. On November 9, 2004, the alleged wire fraud in connection to the EVA election occurred. Approximately a year later, on November 2, 2005, police officers threatened certain citizens with arrest if they tried to enter a neighborhood association meeting. About that same time, the Kane Place property was actually sold to Kohler. Throughout the period from late 2003 to late 2005, Kohler and Fowler are alleged to have received the waivers and grants that Kaye asserts amount to honest services fraud.

Measuring the length of the alleged pattern can prove to be difficult where the plaintiff has not clearly detailed his allegations. In the instant case, pinpointing the beginning of the scheme is somewhat difficult given the vagueness of Kaye's allegations. He insinuates that Kohler and D'Amato were scheming to secure the Kane Place property for Kohler as early as 2000. However, the court thinks it best to say that if this were a properly alleged predicate act, its starting point would be March 2004 – the point where Kaye's bid was denied – because prior to that point,

there is no allegation Kohler was receiving preferential treatment with reference to the Kane Place property. Thus, the first predicate act actually occurred in July 2003 when D'Amato supposedly committed honest services fraud by sponsoring the replatting of one of Kohler's lots. The final predicate act for this scheme to use city organizations to accrue land and privileges to Kohler and Fowler and, presumably, increased power and support to D'Amato, ended sometime in late 2005 when the last of the honest services fraud acts occurred in relation to Kohler and Fowler's properties. Unfortunately, the court's analysis is limited to the allegations found in Kaye's complaint which at best are quite ambiguous and otherwise murky as to the matter of dates. That said, it would appear that the scheme is alleged to have lasted approximately 28 months. There is nothing dispositive about this length of time. Indeed, the courts "have not employed a bright-line rule for how long a closed period must be to satisfy continuity," and "have not hesitated to find that closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity." *Roger Whitmore's Auto Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005).

In applying the remaining factors of the multifactor continuity test, it becomes clear that all Kaye's allegations taken together do not demonstrate closed-ended continuity. For the number and variety of predicate acts, the court is unable to make any meaningful assessment given the fact that Kaye's honest services fraud allegations are so vague and ambiguous. It is clear, however, that there were three variants of predicate acts pledged: bribery, extortion and honest services fraud. All

these acts were tied up in one general scheme to accrue land and benefits ostensibly to Kohler and Fowler, and power to D'Amato. Note that a key point of the alleged wire fraud in connection with the EVA election was to ensure that D'Amato retained power over the EVA, and that EVA would assist in ensuring the Kane Place property was sold to Kohler and that it was exempted from riverwalk requirements. (Am. Compl. ¶¶ 31-32). Thus, even that act was tied up in this single general scheme, as was the police extortion which was designed to ensure that the new neighborhood association did not fall into the hands of those unfriendly to the D'Amato, Kohler, Fowler triumvirate. Most importantly, the entire scheme relied on D'Amato, Kohler and Fowler utilizing their official positions within the city government. Now that all three individuals no longer hold those positions, no inferentially implicit threat of continuation of the alleged pattern can be said to remain.

Given the nature of the allegations, it is very difficult to ascertain the number of victims or distinct injuries. Arguably, if the honest services fraud allegations were true, all the citizens D'Amato, Kohler, and Fowler were supposed to serve as public officials were victims. However, in measuring any implicit threat to these victims, it becomes clear there is no such threat, as none of these defendants are still public officials and the entire scheme relied on the defendants misusing their public office. As for other victims, the bulk of the injuries alleged all have one victim - the city of Milwaukee. The major injury from the honest services fraud would be the misuse of city funds (whether in the form of grants, or in building a bridge so Kohler would not

have to allow a public riverwalk on her property). Similarly, the injury from the land swap scheme would be that of the city missing out on higher bids. Kaye claims that he was injured as a consequence of the land swap scheme, because he assumes he would have been the purchaser if Kohler was not. That is an assumption the law is not willing to make. As defendants correctly point out, the Seventh Circuit case, *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396 (7th Cir. 2007), dictates that the victim of the alleged land swap scheme is the city of Milwaukee, not Kaye. In *James Cape*, which relied heavily on the Supreme Court case, *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1994 (2006), the court upheld dismissal of plaintiff's civil RICO claim, in part because plaintiff had not shown that its injuries were proximately caused by the defendant's bid-rigging scheme. *James Cape*, 453 F.3d at 404. The plaintiff alleged that it would have been the recipient of some of the contracts that the defendant won through the bid rigging scheme, but the court said that it was uncertain "whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'" *Id.* at 403 (quoting *Anza*, 126 S.Ct. at 1997-98). Similarly, there is no way to discern whether Kaye would have been awarded the Kane Place property or not. The court in *James Cape* also pointed to *Anza* for the proposition "that a direct causal connection is 'especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims.'" *James Cape*, 453 F.3d at 404 (quoting *Anza*, 126 S.Ct. at 1998). Here, the city of Milwaukee – like the city of New York in *Anza*, and

Case 2:05-cv-00982-JPS   Filed 12/18/08   Page 24 of 27   Document 100

the WisDOT in *James Cape* – "is fully capable of pursuing appropriate remedies" itself. *James Cape*, 453 F.3d at 404.[6]

It is clear from examining all the relevant factors that, even if all the allegations were true, they would essentially allege acts designed around one scheme in order to divert land and financial benefit to Kohler and Fowler, and presumably to shore up D'Amato's power. The scheme would have lasted about 28 months, consisted of three different types of predicate acts, and would have had only one victim that suffered a financial injury. Most importantly, not only would the scheme have ended (Kohler and Fowler got the land and the grants – that is over with), but it would also carry with it virtually no threat of continuing, as none of the defendants hold the official positions they allegedly used to their advantage. Indeed, none of Kaye's alleged predicate acts "amount to, or threaten the likelihood of, continued racketeering activity." *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991). Moreover, the fact that the alleged scheme ended by reaching its natural termination point, amply demonstrates the lack of continuity. Criminal activities that have "a built-in end point" do not meet RICO's continuity requirement if that end point is already passed. See *Gamboa v. Velez*, 457 F.3d 703, 708 (7th Cir. 2006). Here, the scheme can only exist during the defendants' tenure in office, after that point, it must end, and indeed its purpose (to use their offices to their advantage) ends as well. This termination point is inherent in the nature of the

_____

[6] In addition to meaning that the city is the major victim for purposes of applying the multifactor continuity test, the foregoing analysis demonstrates Kaye has not sufficiently pled injury, which is yet another reason why Kaye's bribery allegations should be dismissed.

scheme, thus it is a built-in termination point. Not only does Kaye's alleged scheme have a built in termination point, but there is also a complete lack of indication that the perpetrators have, will, or even could engage in similar misconduct – thus Kaye's allegations "[do] not sufficiently allege continuity for § 1962(c) purposes." *Gamboa*, 457 F.3d at 709.

## III. CONCLUSION

In sum, Kaye has only sufficiently alleged two predicate acts. In the final analysis, these two allegations of extortion amount to isolated events that, while perhaps related, certainly do not begin to demonstrate any kind of continuity, and clearly do not amount to a pattern of racketeering. Indeed, even if all of Kaye's allegations were sufficiently pled, he still would not have met the continuity requirement, and his allegations would remain ripe for dismissal. Because the "requirements for a claim under federal RICO law apply to a claim under the Wisconsin law except where the Wisconsin legislature expressly chose alternative requirements[,]" plaintiff's WOCCA claims are also ripe for dismissal. *City of Milwaukee v. Universal Mortgage Corp.*, 692 F. Supp. 992, 1001 (E.D. Wis. 1988); *see Brunswick Corp. v. E.A. Doyle Mfg. Co.*, 770 F. Supp. 1351, 1363 (E.D. Wis. 1991) (holding "that the relevant analysis for a racketeering pattern under WOCCA is the same as under RICO").

Accordingly,

**IT IS ORDERED** that defendants' Motion to Dismiss Plaintiff's Amended Complaint (Docket #90) be and the same is hereby **GRANTED**;

-26-

**IT IS FURTHER ORDERED** that this action be and the same is herewith

**DISMISSED** on the merits and together with costs as taxed by the clerk of court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of December, 2008.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge